[No. F005145. Fifth Dist. Nov. 14, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ESTEVAN ARREOLA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exceptions of parts I, III and V.

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Cynthia A. Thomas, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and W. Scott Thorpe, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**FRANSON, Acting P. J.—**

### THE CASE

Appellant stands convicted after jury trial of seven felony counts. In counts one and two, the jury found appellant guilty of the first degree murders of Evaristo Reynoso and Luciano Renteria. The jury also found that in the commission of these murders appellant personally used a rifle and committed a multiple murder special circumstance within the meaning of Penal Code section 190.2, subdivision (a)(3).

Counts three through seven involved the attempted murders of five additional victims. The jury also found that appellant used a rifle in the commission of the attempted murders.

Appellant was sentenced on count one to life in prison without possibility of parole with the rifle use enhancement stayed; on count two, appellant was given the same sentence but it was ordered stayed; on count three, appellant received the upper term of nine years, plus two years for the firearm enhancement. On each of counts four through seven, the court imposed one-third the middle term or twenty-eight months to be served consecutively to the term imposed for count three, and the court stayed the firearm enhancements for those counts.

## THE FACTS

During late February and early March of 1984, Alejandro Hernandez (the victim in count three) and Jose Negrete were involved in a dispute over money. Hernandez said Negrete owed him roughly $3,500 for a telephone bill; the two had recently been roommates. There was evidence that Hernandez also owed Negrete other money, a debt stemming from a heroin deal.

The dispute erupted into violence in the early hours of March 3, 1984. On the previous day, March 2, Isidro Reynoso, his children Odelia, Israel and Evaristo, and son-in-law, Luciano Renteria, had stopped at Hernandez's rented house on their way from Tijuana to Oregon. They stopped to pick up Gregorio Venegas and Maximilliano and Virgilia Reynoso, who were to accompany them to Oregon. They left again that afternoon, but developed car trouble and returned to Hernandez's house in the evening. The group went to sleep; Isidro, Odelia, Israel, Evaristo, Luciano and Gregorio all slept in the living room on two sofas and a mattress, and the others slept in another room.

Sometime later, Negrete, Serrano and appellant arrived, asking to see Hernandez. Isidro Reynoso awoke when they entered the house; he overheard one of the others tell Negrete that Hernandez was not at home. The three men then left.

About 1 or 2 a.m. on March 3, Hernandez returned home along with his son Fernando and Antonio Britas. The three men went to Hernandez's bedroom to go to sleep. Hernandez arose, however, when he heard Gregorio Venegas calling him to tell him that Negrete, Serrano and appellant were back. Hernandez went to talk to the men in the dining room. He observed that Negrete had a .45 caliber pistol at his waist; Serrano and appellant each had a rifle. The rifles, later recovered, were a Ruger ranch rifle and a Ruger Mini 14, each semiautomatic, each firing a .223 caliber cartridge. Hernandez was carrying a .22 caliber pistol in his belt. Negrete ordered Hernandez to take out his gun, because he (Negrete) was going to shoot. Negrete then

pulled out his pistol and began shooting, hitting Hernandez, who ran to the bathroom. There Hernandez drew his gun and shot back at Negrete, who ran wounded from the house. Serrano and appellant, still in the dining room, opened fire on the six who had been asleep in the living room. Then appellant went outside and fired several shots through the window into the living room. Killed in the shooting were Evaristo Reynoso and Luciano Renteria; wounded were Alejandro Hernandez, Isidro Reynoso, Israel Reynoso, Gregorio Venegas, and Odelia Reynoso.

Sheriff's department investigators searched the house and surrounding area. They found within the house eight expended .45 caliber casings and two expended .45 caliber bullets; twelve .22 caliber expended casings and six unexpended bullets; twenty-eight expended .223 caliber casings and eight .223 caliber expended bullets or fragments. Also found were the fragments of three bullets whose caliber could not be determined. Outside the house were found eleven .223 caliber casings, twelve .22 caliber casings, three .38 caliber casings, one .45 caliber casing and one expended .45 caliber slug.

The .223 caliber casings were compared to casings run through the ejectors of the two rifles used by Serrano and appellant. Three .223 caliber casings found in the dining room were fired from the ranch rifle; three casings found outside the residence also had ejector marks from the ranch rifle. The remaining twenty-five .223 caliber casings found within the residence and eight casings found outside were ejected from the Mini 14.

Arrested the next day, appellant waived his *Miranda* rights and gave a statement to the police. He stated he had arrived at Hernandez's house with Negrete and Serrano at about 2 a.m., and proceeded to the bathroom. When he emerged, Negrete and Hernandez were arguing. Both went for their guns at the same time, and appellant and Serrano went outside. When Negrete emerged wounded from the house, Serrano went back inside and began shooting, while appellant fired five or six rifle shots through a window into Hernandez's bedroom. He indicated that it was his express intent to kill Hernandez.

Appellant's defense consisted primarily of the testimony of Herineo Serrano and appellant himself. Serrano testified that it was common for the men to fire their weapons, both inside and outside of Hernandez's house, "[j]ust firing into the wind," and that cartridge casings lay around the house. He stated that on the night of the shootings, Negrete and appellant picked him up to go drinking; appellant was already intoxicated. They drank at a Selma bar until closing time, when they drove to the home of Emeterio Santibanes to pick up the guns, then proceeded to Hernandez's house.

Serrano thought they were going there to drink with Hernandez. They armed themselves and entered the house, and Negrete called for Hernandez, who joined them in the dining room. Negrete and Hernandez talked about money for several minutes, and when the conversation became heated, Negrete ordered appellant and Serrano outside. Serrano then heard several shots, and Negrete emerged from the house, bleeding from the neck and shoulder area. Negrete ordered Serrano to "go inside and shoot inside that house." Serrano went to the dining room and fired off several shots, but claimed not to know into what room he fired or whether anyone was in the area toward which he aimed. At trial Serrano demonstrated how he held the gun, "parallel to the floor, about chest high."

Appellant's story was slightly different. On their arrival at Hernandez's house, appellant testified he went to the bathroom. After he returned to the dining room, Hernandez and Negrete drew their pistols, but appellant intervened. Negrete then ordered appellant and Serrano outside, saying "that they were going to kill each other." Appellant and Serrano went outside, but when some time had passed without shots being fired, the two reentered the house. There appellant saw the two men draw their pistols again and Negrete shoot Hernandez. After Hernandez in turn wounded Negrete, Negrete headed outside, beckoning for Serrano and appellant to follow. They went to Negrete's truck, where Negrete ordered Serrano and appellant at gunpoint to "[r]evenge yourself for me." Serrano and appellant got out of the truck with the rifles, and appellant shouted to Serrano for him "to fire into the wind," but Serrano went inside the house. Appellant heard shots from within; he testified that he personally fired only one shot, through the window into the northeast bedroom.

DISCUSSION

I.

*Was evidence on drug smuggling properly admitted?\**

. . . . . . . . . . . . . . . . . . . . . . . .

II.

*Was it error to apply the transferred intent doctrine to convict appellant of first degree murder?*

At trial, the prosecution presented three theories on which the jury could have based its verdicts of guilty for the two first degree murder counts. The

---

*See footnote, *ante,* page 1570.

first and most obvious theory was that appellant actually shot Evaristo Reynoso and Luciano Renteria with the premeditated intention of killing them. Second, the jury could have found appellant to have aided and abetted Serrano in the killings. Third, the jury could have found appellant guilty on a transferred intent theory, finding that appellant intended to kill Hernandez but shot the others inadvertently.

█ Appellant contends that the transferred intent doctrine should not be used to obtain a first degree murder conviction. While he supports this contention with citations to scholarly criticism of the use of this "fictional doctrine" in the criminal law context, this court is bound by the law as defined by the Supreme Court, which has stated: "[I]f a person purposely and of his deliberate and premeditated malice attempts to kill one person but by mistake and inadvertence kills another instead, the law transfers the intent and the homicide so committed is murder of the first degree." (*People v. Sears* (1970) 2 Cal.3d 180, 189 [84 Cal.Rptr. 711, 465 P.2d 847].)

We are bound by the Supreme Court's approval of the transferred intent doctrine.

### III.

*Did the trial court err in failing to instruct the jury in the language of CALJIC No. 17.01?** 

. . . . . . . . . . . . . . . . . . . . . . . .

### IV.

*Was the use of transferred intent to find the multiple murders special circumstance a violation of equal protection of the laws and appellant's right against cruel and unusual punishment?*

Appellant argues that even if the transferred intent doctrine permits his murder convictions (see issue II, *ante*), it should not be used to impose a special circumstance. He bases this argument on the assumption that the intent required for a special circumstance finding is the intent to kill *the victim*. He fails to support this assumption with pertinent case law. As he notes, "Admittedly, the jury was instructed in accordance with *Carlos* [*Carlos v. Superior Court* (1983) 35 Cal.3d 131 (197 Cal.Rptr. 79, 672 P.2d 862)] in that it had to find appellant intended to kill a human being. However, the jury may never have reached the question of whether appellant intended to kill the victims, even if it found he intended to kill Hernandez.

---

*See footnote *ante*, page 1570.

Essentially, the transferred intent theory interfered with the jury's duty to properly find the requisite mental state of intent to kill."

It appears that the *Carlos* court anticipated this argument. In the final paragraph of its opinion, the Supreme Court stated: "Since the evidence presented at the preliminary hearing in the present case is plainly insufficient to establish reasonable cause to believe defendant intended to kill the victim *or any other person,* defendant cannot be tried on a felony murder special circumstance allegation." (*Carlos, supra,* 35 Cal.3d at p. 154, italics added.) While we have not found any cases dealing with facts similar to those in the instant case, it appears that the intent to kill required for a murder special circumstance need not be the intent to kill the ultimate victim.

Appellant cites *Carlos* for the argument that the deterrent effect of capital punishment is lost on one who commits an accidental or negligent killing. The *Carlos* court, however, was addressing the felony murder setting, where there may in fact be no intent to kill at all. Any deterrent effect capital punishment may have on a prospective killer will not be lost on one who, like appellant, intends to kill, attempts to kill, and in the attempt inadvertently takes the life of one whom he did not intend to kill.

V.

*Must the multiple murders special circumstance finding be reversed due to principles of statutory construction, equal protection, and cruel and unusual punishment?\**

. . . . . . . . . . . . . . . . . . . . . .

The judgment is reversed as to the attempted murder conviction on count three. The judgment is affirmed in all other respects.

Hamlin, J., and Ballantyne, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 11, 1987.

---

\*See footnote *ante,* page 1570.